## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA    ) | |
| ) | |
| v.                          ) | CRIMINAL NO. 15-10292-NMG |
| ) | |
| JOSEPH DEBRUM               ) | |

### DEFENDANT'S SENTENCING MEMORANDUM

The two overriding features that dominate this Court's sentencing of Joey Debrum are undisputed. The first is the seriousness of his offense conduct. Neither the gravity of his actions nor the harm he inflicted on the victims of his internet harassment can be ignored. The second feature that is beyond any dispute is Debrum's extraordinary medical condition, including the toll it has taken on him in the past and the immense challenges it will impose on others going forward. The task before the Court in this unique constellation of facts is to determine how much is enough, what sentence is sufficient, but not greater than necessary, to punish a man whose everyday existence is more punishment to him than any nondisabled person can truly imagine. For the reasons that follow, the Court should sentence Debrum to 180 months in prison followed by ten years of supervised release because such a sentence is manifestly sufficient but not greater than necessary to achieve the four purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2).

### I.  DEBRUM'S HISTORY AND CHARACTERISTICS

   a.  **Background**[1]

---

[1] The information regarding Debrum's physical condition laid out in this section and the next, "Debrum's Current Functioning and Care," is culled from medical records and doctor orders from the myriad providers Debrum has encountered in his lifetime, and most recently, by the providers contracted by the United States Marshals. All of the records have been provided to the Probation Department. For the sake of readability and brevity, undersigned counsel has eschewed direct quotes and citations to any of the medical records. To the extent there are disputes regarding the specific demands Debrum's physical condition places on day-to-day caregivers assisting him with the activities of daily living, Debrum's

Debrum is 40 years old. He was born with spina bifida, a permanently disabling birth defect that manifests when a child is in the womb and the spinal column does not close completely. Debrum's father left his life shortly after his birth, and they have never had any contact or relationship. His mother, Filomena Bruneau, with whom he was living on house arrest until his surrender to the United States Marshals ("USM") when pleading guilty, raised him as a single mother.

He graduated from the Massachusetts Hospital School with a high school diploma and was able to work for only a short period of time until, as outlined below, his chronic incontinence and the psychological consequences of that condition made continued employment untenable.

Debrum's spina bifida diagnosis is accompanied by a host of chronic physical symptoms that are documented in the voluminous medical records generated over the course of his lifetime and summarized in the PSR. *See* PSR ¶¶161-171. He is 4'11" tall and weighs 231 pounds. He has scarring on his abdomen, hips, back, head, and left leg, all of which are results of spina bifida and surgeries for hip dysplasia. The secondary conditions he is plagued with can be summarized as follows:

1. Paraplegia – Since birth, Debrum has had limited feeling and ability for movement below the waist. He used crutches until the age of 16, when his lower extremities reached paralysis and he became confined to a wheelchair.

2. Incontinence – Throughout his life, Debrum has been unable to control urine release and bowel movements. He wears a urostomy bag; because of problems attaching the bag to his stoma, the bag constantly leaks urine. Debrum wears incontinence briefs, i.e., adult diapers.

3. Pressure Wounds – Unable to stand or walk, Debrum has spent the greater part of his life lying in bed and sitting in a wheelchair. This has put constant pressure on certain

---

mother, Filomena Bruneau, will be available to testify at the sentencing hearing.

parts of his body. Debrum cannot feel pain in those areas, so pressure wounds form quickly and often.

4. <u>Diabetes</u> – He has Type II diabetes mellitus and is insulin-dependent. This contributes to lower extremity ulcers and frequent infections.

5. <u>Obstructive Sleep Apnea</u> – Debrum must use a bilevel positive airway pressure machine so that he can breathe at night.

6. <u>Blood Pressure and Cholesterol</u> – Debrum is obese and has high blood pressure and high cholesterol. He takes medication for both.

7. <u>Other</u> – Debrum has hypertension and hyperlipidemia, a history of kidney stones, and hydrocephalus that is managed with a shunt inside his skull.

Not surprisingly, given the practical reality of near total physical disability, Debrum suffers from depression. He has expressed self-loathing and extreme embarrassment with respect to his health problems. The incontinence is his greatest source of shame. His sole period of employment, performing menial clerical tasks for five years at General Dynamics, ended at the suggestion of a psychotherapist because the smell caused by his incontinence made him feel humiliated. He has lived on Social Security Disability Income since that time. As an adult he has continually relied on persons to assist him in his activities of daily living. For years his significant other, Nancy Reardon, primarily attended to his multitudinous needs, and more recently while on house arrest his mother, Filomena, has cared for him.

### b. Debrum's Current Functioning and Care

As the government has acknowledged, Debrum's constellation of physical needs are exceptional. D.E. 106, Transcript of April 7, 2017 Status Conference, at 7. He requires 24-hour nursing care, as well as access to specialists and emergency care, to address his array of health complications.

Debrum's most pressing and constant need is incontinence management. Because he cannot control urine release, he excretes urine through a stoma in his stomach into a urostomy

bag. The stoma leaks, however, and the urine cannot be contained, even with the help of the incontinence briefs he must always wear. Consequently, a caregiver must create a custom dressing to absorb the leaking urine. The leaking greatly increases his risk for skin breakdown and infections in the areas affected by the leakage of the stoma, so the site must be frequently assessed for any signs of infection, and kept as clean and dry as possible throughout the day. Furthermore, Debrum experiences leakage of loose stool throughout the day, which requires bathing and attentive management of his fecal incontinence. To prevent infection as a result of the fecal leaks, Debrum requires frequent changes of his incontinence brief throughout the day, and the skin must also be kept as clean and dry as possible.

  Another task required is for someone to shift Debrum's position every two hours to prevent skin breakdown and pressure ulcers. This includes moving him from side to side, laying down to sitting upright, from his bed to his wheelchair, and vice versa. Debrum's other daily needs include management of morning and evening medications, of which there are eight in total, according to records. Due to his diabetes, Debrum requires blood sugar monitoring four times each day and insulin shots twice daily. He also requires a special diet to maintain proper insulin levels. Debrum must use his sleep apnea machine each night for approximately eight hours.

  Beyond the day-to-day care Debrum needs access to specialists for routine as well as urgent care. When Debrum has pressure wounds, he must be taken to a wound clinic as often as weekly to treat the ulcer. In the past, every three months or as needed, Debrum has seen his endocrinologist. Every six months or as needed, he has followed up with his neurologist, gastroenterologist, urologist, pulmonologist, and podiatrist. He also has seen his ophthalmologist on a yearly basis. Even with this careful routine, Debrum has required frequent emergency care

and hospitalization due to infection. As set forth in detail below, his well-being in federal prison will undoubtedly suffer without regular access to these specialists and care. Providing such access will consume precious Bureau of Prisons ("BoP") resources.

### c. Lessons Learned from Debrum's Pretrial and Presentence Detention

The challenges BoP will face providing even the most basic care Debrum requires has been borne out by the USM's experience in housing him for the short time he has been in their custody. Debrum's pretrial detention at the inception of this case for six weeks at Albany County Correctional Facility ("ACCF") – the sole facility available to the USM at the time because it was the only one equipped with a medical staff arguably able to treat Debrum while detained – was fraught with difficulties for everyone involved. ACCF staff were reluctant to clean Debrum's bodily waste on a regular basis, leading to staff friction in properly addressing his then-infected pressure wounds. Further, he was assigned a hospital gown instead of adequate clothing, likely for the convenience of the staff members tasked with changing his clothes. He felt cold and exposed as a result. Debrum's physical needs required ACCF to isolate him during the six weeks he spent in detention there. He was kept in a single-occupancy cell in the infirmary. Recreation was limited to wheeling himself into the hallway outside his cell, and the offer of a single hour of recreation yard time by himself each day, if and when the facility was able to shut the yard off to other inmates. He had no contact with other inmates. According to the USM,[2] ACCF charged it **$400 per day** for a total of **$16,000** to house Debrum for the six weeks he was there. Notwithstanding the high reimbursement rate, ACCF refused the USM's request to

---

[2] The cost figures referenced in the following paragraphs were provided to the parties in response to defendant's request to the USM. Because the USM continues to receive and process billing and reimbursement requests for Debrum's care on an ongoing basis, the stated figures likely underestimate the actual costs.

accept Debrum as a detainee upon his guilty plea before this Court once it learned Debrum had an active pressure wound. *See* D.E. 106, Transcript of April 7, 20017 Status Conference.

In the lead-up to Debrum's April 14, 2017 Status Conference, the USM believed it had located a facility that it could substitute for ACCF, the Onondaga County Jail in Syracuse, NY. The USM's faith that the Onondaga Jail was an appropriate facility for adequately addressing Debrum's medical needs while in custody would prove short-lived. After surrendering to custody in the wake of his guilty plea, Debrum was transported by ambulance to Syracuse. (In addition to the cost of the two Deputy U.S. Marshals ("DUSM") (**$913.72**) required to accompany Debrum, the ambulance service initially billed the USM for **$19,860.** The USM later negotiated the payment to the ambulance company down to **$2,521.07** for the trip.)  He was admitted to the Onondaga County Jail infirmary, which was operated by Correct Care Solutions, a private firm. Staff at the infirmary immediately noted Debrum's urine and stool incontinence and a stage 2 pressure wound on the back of leg. Intake staff recommended a specialty mattress, a side rail/or trapeze for bed mobility, a skin consult and other preventative measures to avoid and prevent continued skin breakdown. Less than eighteen hours after having arrived at the jail, Correct Care's attending doctor ordered that Debrum be sent to the emergency room at Upstate University Hospital in Syracuse for a wound evaluation and to address a suspected urinary tract infection (UTI).

Debrum was admitted to Upstate University Hospital and remained there for the next seven days. He was noted to have pain as a result of the UTI and upon admission was also discovered to have a large ventral abdominal hernia. He met sepsis criteria because of a high heart rate upon admission. The medical staff noted foul drainage from his catheter and noted the catheter had a green film to it. They reapplied dressings that had to be changed several times

during the shift because of the large amount of drainage.

The progress notes documenting the exchange between the hospital and the Correct Care staff at the Onondaga County Jail is illuminating of the challenges Debrum's care presents:

> **Progress Notes by Susi Koshy, Nurse Practitioner at 4/17/2017 3:21 PM** -- Called to give report (doc to doc) and spoke to Dr. Solomen. When I started giving report, Dr. Solomon stated, *"is this the guy with spina bifida and a catheter, we cannot manage him over here, his transfers and all he needs so I cannot accept him back"*. I then asked her, "but did he not come to us from you" and to that she answered, *"yes, but we did not know about him when we accepted him from another facility, and now you will have to find a place for him in a federal facility"*. I then told her that I will speak to my attending physician and call her back.
>
> **Progress Notes by Andrea Kite, Registered Nurse at 4/17/2017 3:38 PM** -- Spoke with Christian Jingrow who is the NA at the Justice Center. I asked why the patient could not go back and she said *this patient was left with them on a Friday and they could not medically met his needs. He will at some point be transferred somewhere else via US Marshall. It was agreed that placement was not the hospitals responsibility nor could we every set this in place.* Christina agreed and said they have already started the process to turn him over to the Marshall and will call daily to give updates. *For now they cannot provide the care that the patient requires.* Information passed on to Suzi Koshi.
>
> **Progress Notes by Rachele Grant, Registered Nurse at 4/17/2017 6:35 PM** -- Suzi Koshy notified to call doc to doc report. When she spoke with them, facility unable to accept pt back due to medical needs. Abx switched to PO. *Discharge on hold until pt could be safely placed with marshals*.

(emphasis supplied). Debrum thus remained at Upstate University Medical Center while the USM determined next steps. Upstate University Medical Center billed the USM for **$39,531** for the week Debrum spent there. The Onondaga Sherriff's department billed the USM for **$102.50** for the few hours Debrum was at their facility and **$6,622.05** to provide guards while Debrum remained at Upstate University Medical Center.

While Debrum remained at Upstate, the USM embarked on a search for a new facility and for a method of transportation to get Debrum there. On April 21, 2015, Debrum was transported by plane to another facility operated by Correct Care in Columbia, SC. The total cost

of this plane, its pilots, ground transportation by ambulance, two nurses to attend to Debrum's medical needs while in transport, and two DUSMs to guard him on the one-way trip to Columbia was **$9,922.91**.

Debrum has remained at Correct Care's Regional Care Center in Columbia, SC facility ever since. Correct Care charges the USM a per diem rate of **$727.03** to house Debrum. *Cf.* PSR ¶195 (advisory by the Administrative Office of the U.S. Courts estimates daily cost of incarceration to be **$84**). It billed the USM for **$7,494.32** for the ten days Debrum was in its care during the month of April, and has billed an additional **$22,564.93** for the month of May, for a total of **$30,059.25**. *Cf.* PSR ¶195, *supra*, (estimating average *annual* incarceration cost per inmate at **$30,621**). Debrum has been at Correct Care for an additional month and a half since May; although its bill has not yet been processed, it is reasonable to calculate that the total bill from Correct Care to detain Debrum prior to sentencing has now exceeded **$60,000** and is climbing. Correct Care's charges do not include transportation and costs for a recently conducted outside consultation with a urologist that the staff considered medically necessary to properly assess and treat Debrum's chronic stoma leakage issue.

Debrum's chronic medical issues continue unabated. The staff at the Regional Care Center struggles to manage his incontinence issues, which in recent weeks has featured diarrhea. The pressure wound he arrived with has abated somewhat, but still requires drainage and dressing. Soon after Debrum arrived in South Carolina, the staff at the Regional Care Center sought authority from the USM for an outside urology consult. Confusion regarding the appropriate channel to gain approval for the consult resulted in a delay of several weeks, and the consult was only recently accomplished. A request for records is pending.

Debrum reports that he has been offered limited opportunities to transfer to a wheelchair

– a task that requires the assistance of multiple staff members – and so remains bed bound for the vast majority of his days. Since arriving at the facility twelve weeks ago, he has been afforded just two showers.

The USM has indicated it will again need to charter a jet to secure Debrum's appearance at his sentencing hearing. It will seek to return him the same day, again by jet, because there is no facility in Boston that will accept Debrum and the medical conditions he presents, even for one night.

## II. WHAT DEBRUM AND THE BOP FACE UPON DEBRUM'S TRANSFER OF CUSTODY TO THE ATTORNEY GENERAL.

### a. The Challenge of Addressing Debrum's Medical Condition Generally

Phillip Wise, a former Warden and Assistant Director of the Federal Bureau of Prisons, reviewed Debrum's medical history and the factual allegations against him. Mr. Wise's opinion letter and c.v. are attached hereto as Exhibit A. Undersigned counsel has arranged for Mr. Wise to be present at the sentencing hearing to testify should there be any dispute regarding the future course of Debrum's care and treatment while in BoP custody.

In Mr. Wise's opinion, which is grounded on more than 25 years of experience in the BoP and his review of Debrum's medical records, is that "few correctional facilities [have] sufficient resources to manage Mr. Debrum's medical requirements on a long term basis." As a result, "Mr. Debrum's experience in prison will be substantially more difficult than that of a healthy inmate because his condition limits and puts him at risks in ways federal prisons are not well-equipped to address."

Mr. Wise goes on to explain that Debrum will require an enormous amount of BoP staff and space resources to maintain even a minimum level of personal hygiene. The incontinence care will be particularly resource-intensive as it will call for a constant flow of labor and

bedding, diapers, and other materials. As discussed in more detail below, Debrum will likely be assigned a "companion," an inmate from the institution's general population, to help with toileting, transporting Debrum in a wheelchair, and perhaps assisting Debrum with the necessary task of shifting him every two hours to help prevent pressure wounds. The companion might be tasked with bringing Debrum his meals.

For bathing, "as many as 3 staff" members will be necessary to move and clean Debrum. His bedclothes will need to be washed and changed frequently. He will also require placement in a specialized facility with a medical bed, "a valuable and limited resource in a correctional system." In short, Mr. Wise believes that "[a] prison may not be able to consistently devote such resources to [Debrum]" to help him maintain basic cleanliness.

Debrum's medical requirements, according to Mr. Wise, "require trained clinical staff including nursing, physicians, pharmacists and ancillary staff," who may not be available as often as required. The BoP's persistent medical staffing shortages will exacerbate the staffing availability problem, given that some BoP institutions suffer vacancy rates of 40% or higher and the already depleted medical staff is often routinely assigned guard duties and other security-related tasks drawing them away from medical duties. *See* Office of the Inspector General, U.S. DoJ, *Review of the Federal Bureau of Prisons' Medical Staffing Challenges*, March 2016[3]; USA Today, *Nurses Thrust Into Guard Duty at Federal Prisons*, April 26, 2016.[4]

Quite apart from the chronic lack of available staff, some of Debrum's needs may not be met for institutional reasons. For example, Mr. Wise points out that Debrum's current form of insulin is generally considered "unsafe in most correctional environments." He also "should not

---

[3] Available at https://oig.justice.gov/reports/2016/e1602.pdf.
[4] Available at https://www.usatoday.com/story/news/nation/2016/04/26/nurses-federal-prisons-public-health-service-security/83517298/.

- 10 -

expect his meals to accommodate his diabetic needs." Beyond unmet needs, Debrum will be susceptible to new health risks, including MRSA infections because of open bedsores.

### b.  Treatment of Debrum's Pressure Wounds

Pressure wounds, colloquially known as bedsores, have been a constant problem throughout Debrum's lifetime. Treatment of that condition will be particularly problematic in the correctional setting because of the lack of staff resources required for effective prevention.

Inevitably, Debrum will require medical intervention through an outside wound clinic. Mr. Wise notes that transportation to a wound clinic is "resource intensive," and "may not occur as swiftly or frequently as medically necessary." Mr. Wise's observation is supported by a recent report from the Office of Inspector General, which noted that

> [T]he increasing aging inmate population has resulted in an increase in trips outside of institutions to address their medical needs. We found that institutions lack Correctional Officers to staff these trips and have limited medical staff within institutions to address aging inmates' medical needs.

Office of the Inspector General U.S. Dep't of Justice, *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons*, 16–17, (rev. 2016).[5] The limited availability of transportation to outside providers is especially concerning in Debrum's case because it is exceedingly unlikely that anyone in a federal prison will be able to shift Debrum's position as often as required, increasing the likelihood and frequency of open sores that require specialized treatment.

Moreover, the rate at which Debrum develops pressure wounds and their severity is likely to grow exponentially as he ages regardless of the care – or lack of it – he is afforded while in BoP custody. Numerous studies have found a correlation between increased age and frequency of pressure wounds. One recent study in particular found that pressure ulcers became more

---

[5] Available at https://oig.justice.gov/reports/2015/e1505.pdf.

common for people with spina bifida as they age. Sunkyung Kim et al., *Factors Associated With Pressure Ulcers in Individuals With Spina Bifida*, 96(8) Archives of Physical Medicine and Rehabilitation 1435 (2015).[6] Another study on the frequency with which pressure ulcers develop in hospitalized patients found that "the risk difference between the youngest and the oldest patients was 10-fold." Thomas V. Perneger et al., *Hospital-Acquired Pressure Ulcers: Risk Factors and Use of Preventive Devices*, 158(17) Arch Intern Med. 1940 (1998).[7]

In addition to the pain these wounds will cause Mr. Debrum, the cost to treat of these increasingly frequent ulcers will likely be very high. In 2003, "[t]he mean charge for hospital stays principally for pressure sores was **$37,800**, but charges varies by payer; e.g., the average charge billed to Medicaid was **$39,100** while an average charge of **$25,600** was billed to the uninsured." C Allison Russo and Anne Elixhauser, *Hospitalizations Related to Pressure Sores, 2003: Statistical Brief #3*, Rockville (MD): Agency for Healthcare Research and Quality (US) (2006).[8] Hospital stays for pressure sores lasted 13 days on average. *Id*. Of course, the costs to the BoP will be exponentially higher because of the cost of assigning round-the-clock guards to accompany him during his hospital stays.

The frequency of Mr. Debrum's pressure wounds over time carries a further risk and cost in a prison setting. "Chronic wound patients are clearly a high-risk group for the acquisition, carriage and dissemination of antibiotic-resistant organisms." R. S. Howell-Jones et al., *A review of the Microbiology, Antibiotic Usage and Resistance in Chronic Skin Wounds*, 55(2) J. Antimicrobial Chemotherapy 143 (2005).[9] The longer Mr. Debrum's time in BOP custody

---

[6] Available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4519375/.
[7] Available at http://jamanetwork.com/journals/jamainternalmedicine/fullarticle/209370.
[8] Available at https://www.ncbi.nlm.nih.gov/books/NBK63508/.
[9] Available at https://academic.oup.com/jac/article/55/2/143/856735.

extends, the more likely it will become that he will acquire and pass on to other inmates antibiotic-resistant organisms. This in turn could increase the cost to the BOP even further, as "[w]hilst the additional impact of antibiotic-resistant organisms on wound healing is not known, overall, the morbidity, mortality and cost associated with infections in hospital patients caused by antibiotic-resistant organisms has been shown to be 1.3- to 2-fold higher than infections caused by antibiotic-sensitive organisms." *Id*.

### c. The Assignment of a Companion Is Fraught With High Risk of Abuse

Mr. Wise predicts that Debrum will likely be assigned a "companion," an inmate from the institution's general population, to help with toileting and other tasks that staff is unable or unwilling to do, which as Mr. Wise notes "could make him vulnerable to threats or extortion." His concern is well-founded. The Office of Inspector General concurs has noted that inmate companions have substantial power to exploit the disabled inmates, particularly when they are in constant contact with the disabled individual. *Ageing Inmate Population*, *supra,* at 21. The OIG reports a chilling anecdote about:

> an inmate who had an inmate companion who was threatening the inmate's wife and forcing her to send money in return for the inmate's protection. The inmate told the Supervisor that it had been going on for a long time but that he had been unable to tell institution staff because the companion accompanied him everywhere, including to personal meetings with staff.

*Id.* at 21.

### d. BoP's Inability to Harmonize Adequate Care of Debrum's Physical Needs with His Sex Offender Designation May Lead to Psychological Abuse

In Mr. Wise's view, the facility best suited to house Debrum is FCI Devens. This prison has inpatient medical care available,[10] as well as a sex offender management program. One sticking point in BoP's consideration, however, might be that FCI Devens does not typically take inmates for decades long sentences. It may be the case that Debrum is transferred to FCI Devens after serving the bulk of his time in a prison where he will either be extremely vulnerable to abuse, in complete isolation, or both.

A confounding challenge for BoP, based on Mr. Wise's experience, will be to find an inpatient medical bed in a prison that can safely house sex offenders for a lengthy period of incarceration. Medical facilities such as MCFP Springfield and FCI Butner can hold inmates for long sentences, but do not have sex offender management programs. If assigned to either prison, Debrum may be placed in a single occupancy cell for his own safety – in effect serving years in solitary confinement through no fault of his own. According to an ACLU report released this year, solitary confinement exacerbates the suffering of inmates with physical health problems:

> Alarmingly, we've found that for prisoners with physical disabilities, solitary confinement imposes additional harms. Prisoners with mobility disabilities, such as those resulting from spinal cord injuries, often rely on regular physical therapy, exercise, and access to proper prescription medications to maintain a healthy existence. Yet the highly restrictive environment of solitary confinement runs completely counter to these health goals.

American Civil Liberties Union, *Caged In: Solitary Confinement's Devastating Harm on Prisoners with Physical Disabilities*, 2017, at 4.[11]

---

[10] Even inpatient cells do not always have the facilities necessary for a paraplegic. For example, at the ACCF, Debrum's cell lacked grab bars and a call switch within reach in case of emergencies.

[11] Available at https://www.aclu.org/report/caged-devastating-harms-solitary-confinement-prisoners-physical-disabilities.

In sum, housing Debrum for the fifteen years required under the statute will be extremely costly. And notwithstanding the astronomical outlay of resources, the actual care Debrum receives will almost certainly be insufficient to meet the demands of his unique physical condition requires. Given this reality, a sentence that results in Debrum's incarceration beyond the fifteen year mandatory minimum is unwarranted.

### III.     THE NEED TO AVOID UNWARRANTED SENTENCE DISPARITY

Section 3553(a) directs the Court to consider the need to avoid unwarranted sentence disparity among defendants with similar records who have been found guilty of similar conduct. 18 U.S.C. § 3553(a)(6). Quite apart from the consideration of the effect Debrum's profound physical disabilities should have on the sentence the Court imposes, a sentence of fifteen years achieves Section 3553(a)'s goal of disparity reduction.

This Court can evaluate disparity by evaluating recent sentences by judges in this District. A review of District of Massachusetts sentences imposed since the Supreme Court's *Booker* decision reveals that sentences exceeding 180 months are rare in sexual exploitation and child pornography cases, and are usually reserved for second offenders, which Debrum is not. *See, e.g.*, *United States v. Pallazola*, Criminal No. 13-10091-WGY (defendant, who had prior conviction for sexual assault, recorded sex acts with young girl and possessed thousands of other images of child pornography, faced GSR of 360-Life; sentenced to 300 months, which Judge Young described as "one of the most severe sentences this court has handed out in quite some time").  More common are sentences at or near the mandatory minimum fifteen years where, as Debrum has done here, a defendant has taken full responsibility for his actions. *See, e.g.*, *United States v. Hiersche*, Criminal No. 12-30017-DJC (defendant who covertly photographed and videotaped his nine year-old daughter and a teenaged niece naked and offered to trade with

another faced GSR of 360-Life; sentenced to 15 years imprisonment by agreement accepted by the court).

Illustrative of the spectrum is this Court's sentencing decision in *United States v. Shipps*, Criminal No. 13-10106-NMG. Shipps had a prior conviction for child pornography and luring a minor for sex. At the time of his new offense, he was a Level II sex offender and was still on probation from the prior conviction. He faced a GSR of 360-Life after he was convicted of photographing his ex-girlfriend's six year-old child in sexually suggestive poses and trading the images with others. Notwithstanding the nominally stratospheric guideline range and Shipps' prior conviction for nearly identical conduct, the government and defendant agreed that a sentence between 228 and 276 months was reasonable.

These three cases militate in favor of a sentence at or near the fifteen year mandatory minimum in Debrum's case. Unlike the defendants Pallazola and Shipps, whose histories contained prior convictions for sexual conduct and thus raised considerations of public protection and incapacitation to their zenith, the offense at issue is the first time Debrum has engaged in the horrific conduct of sexual exploitation. Instead, in terms of the intersection of offense conduct and personal history, Debrum is most similar to Hiersche and should be sentenced similarly.

In any event, no defendant sentenced by this Court, or any other session in this district for that matter, presented the constellation of profound physical disabilities that will make each year of Debrum's incarceration far more difficult for him to serve and far, far more challenging for the BoP to manage.

## IV.     FIFTEEN YEARS' IMPRISONMENT IS AN APPROPRIATE SENTENCE

Under 18 U.S.C. § 3553(a), the Court should impose a sentence that is "sufficient but not greater than necessary" to achieve the four purposes of sentencing set forth in Section 3553(a)(2). The sentence must: 1) reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense; 2) afford adequate deterrence to criminal conduct; 3) protect the public from further crimes of the defendant; and 4) provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. §3553(a)(2). A sentence at the mandatory minimum required by the statute, followed by ten years of supervised release, is sufficient to achieve those goals.

The government has been quite forthright in conceding that Debrum does not constitute a danger to the public. D.E. 106, Transcript of April 7, 2017 Status Conference, at 12. The government's concession is wise, and fully supported by the conjunction of Debrum's unique physical limitations and his demonstrated conduct for the 18 months he was in home detention. Debrum could commit the offenses only through access to, and the anonymity afforded by, the internet. The risk that he could ever offend by an in-person sexual assault is zero. Once access to the internet has been prohibited to him, as it was for the eighteen months he was in home detention after he was exposed, the risk that he could offend in any way is reduced to, and stays at, zero. A term of supervised release that includes heavily monitored internet access or continues the outright prohibition is alone sufficient to perfectly deter Debrum and insure that the public is protected. By the same token, it cannot be argued that 180 months' imprisonment is not serious punishment that will catch the attention of any member of the public that might consider engaging in the conduct that Debrum undertook.

As discussed, *supra*, the need to "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner," 18 U.S.C. § 3553(a)(2)(D), indisputably militates in favor of a sharply reduced sentence. As discussed above, the cost of medical care for Debrum is astronomical in proportion to any incremental gain in the need to incapacitate him, deter him, or deter the public at large. The need for a sentence to accomplish any of these goals will have vanished by the time Debrum, by then in his early fifties, has recorded his fifteenth year in BoP custody.

Which leaves the issue or retribution: what is just punishment for the odious acts he cajoled, enticed, and extorted his victims to commit? This is Debrum's first time in jail in his life. While the offense Debrum committed is undeniably serious, and hence deserving of a significant prison term, his conduct is not dissimilar from other offenders who have received sentences significantly below the guideline sentencing range, even where significant harm resulted. In addition, Debrum, who is 40 years old, will be on supervised release at least until he is in his mid-sixties, which, in addition to its purposes of rehabilitation and protection of the public, does constitute additional punishment.

Furthermore, the Court should recognize the collateral consequences of a conviction in factoring the appropriate sentence.  The collateral consequences of Debrum's conviction are extreme, perhaps more extreme in some ways than any other form of criminal activity. With fifteen years imprisonment still ahead of him, Debrum's age, his fundamentally compromised physical condition and the conviction itself will coalesce to make him a pariah when he emerges from prison. It is a crime of public shame and humiliation. It will be that much harder for him to find housing or for others to even countenance a relationship with him. He likely will be subject to harassment, and maybe violence, both in prison and afterwards in the community. As several

courts have recognized, collateral consequences of conviction are relevant to the "need" for the sentence imposed to reflect just punishment. *See, e.g.*, *United States v. Garate*, 543 F.3d 1026, 1028 (8th Cir. 2008) (overruling prior holding that it was inappropriate for the district court to consider the lasting effects of being required to register as a sex offender); *United States v. Pauley*, 511 F.3d 468, 474-75 (4th Cir. 2007) (affirming the district court's finding that the defendant "warranted a lower sentence because he lost his teaching certificate and his state pension as a result of his conduct," because "[c]onsideration of these facts is consistent with § 3553(a)'s directive that the sentence reflect the need for just punishment," and "adequate deterrence"); *United States v. Gardellini*, 545 F.3d 1089 (D.C. Cir. 2008) (affirming below-guideline sentence based in part on court's findings that defendant suffered substantial mental and personal stress as a result of his prosecution).

## CONCLUSION

For the foregoing reasons, Debrum's unique set of circumstances dictate that a sentence of fifteen years followed by ten years of supervised release is a sentence that is "sufficient but not greater than necessary" to achieve justice in this case. No restitution has been requested and thus none should be ordered. No fine should be imposed.

JOSEPH DEBRUM
By his attorney,


/s/ Timothy G. Watkins
Timothy G. Watkins
Federal Defender Office
51 Sleeper Street, 5th Floor
Boston, MA 02210
Tel: 617-223-8061

## CERTIFICATE OF SERVICE

I, Timothy G. Watkins, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), as well as to U.S. Probation Officer Maria D'Addieco by email, on July 14, 2017.

/s/ Timothy G. Watkins
Timothy G. Watkins