# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Criminal No. 15-CR-10292-NMG** |
| | ) | |
| **JOSEPH DEBRUM,** | ) | |
| **Defendant.** | ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM

Joseph Debrum ("defendant") is a calculating, manipulative, and deceptive child predator with a predilection for minor teenage girls. He targeted vulnerable minor girls for his own perverse sexual gratification. His heinous criminal behavior was neither isolated to one victim nor to one day. Over the course of ten months, he assumed fictitious on-line identities both of a 21 year-old female and a 16 year-old female, when meeting teenage girls on-line. He intentionally preyed upon and victimized multiple young girls, by coercing and enticing them to engage in sexually explicit conduct, including directing them to masturbate, to shower naked, and to insert objects into their vaginas or anuses. He either captured these sexual acts live, or directed his victims to take and email the sexually explicit pictures to him. He also emailed child pornographic photos of a minor victim to another minor victim, and of a third minor victim to her own mother. He used the photographs as leverage against his minor victims. His actions were depraved and deplorable.

The defendant was undeterred in committing his criminal acts. The facts are egregious and call out for a significant sentence. In light of the gravity and severity of the fifteen crimes the defendant has been convicted of which involve multiple victims, his extortionate threats to the victims, his repeated criminal sexual conduct against his targeted victims, his deception, manipulation, extortion and exploitation, his complete lack of sympathy towards any of this

victims throughout the entire time frame of the offense, as well as the 3553(a) factors, the United

States recommends a sentence of 288 months (i.e., 24 years), followed by a period of 5 years of

supervised release, a mandatory special assessment of $1,500, and forfeiture.  Additionally, the

government requests the Court order that the Defendant to have no contact directly or indirectly

with the minor victims, identified as "Minors A, B, C, D, F, G, and H" in the Superseding

Indictment, during the pendency of defendant's incarceration and his supervised release.

Further, pursuant to 18 U.S.C. § 3663A, restitution is mandatory.[1]  Pursuant to the Sex Offender

Registration and Notification Act and the laws of the Commonwealth of Massachusetts,

Defendant is required to register as a sex offender following his incarceration and to keep that

registration current.  The government argues such a sentence is appropriate and warranted in this

case and comports with the factors outlined in 18 U.S.C. § 3553(a).

## I.       SENTENCING GUIDELINES/GUIDELINE CALCULATIONS

### A.       Legal Framework

The advisory United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") are "the

starting point and the initial benchmark" in sentencing.  *Gall v. United States,* 552 U.S. 38, 49-50

(2007).  The Guidelines must be properly calculated and considered, but ultimately the Court

must craft a sentence that sufficiently accounts for the sentencing factors and objectives outlined

in 18 U.S.C. § 3553(a).  *Id.* at 49-50.  Because each case is unique, the Court must make a

particularized analysis of the nature and circumstances of the offense and the defendant's history

and characteristics. *See* 18 U.S.C. § 3553(a)(1).  The Court must then impose a sentence that

sufficiently reflects the seriousness of the crime, promotes respect for the law, and provides just

punishment, and the sentence should adequately deter criminal conduct, protect the public, and

---

[1] To date, no restitution requests have been made.

provide any necessary education, training or treatment.  *See* 18 U.S.C. §§ 3553(a)(2)(A)-(D).
The Court must also strive to avoid unwarranted sentencing disparities among defendants with
similar records who have been found guilty of similar conduct.  *See* 18 U.S.C. § 3553(a)(6).
After determining the appropriate sentence, the Court should adequately explain its rationale to
"allow for meaningful appellate review and to promote the perception of fair sentencing."  *See*
*Gall*, 552 U.S. at 50.

### B.    The U.S.S.G. Calculations

On April 14, 2017, the defendant pled guilty to the fifteen-count superseding indictment.[2]
He faces a mandatory minimum sentence of 180 months and a maximum sentence of thirty years
on each of the six Sexual Exploitation of Children counts (i.e., counts 2s, 4s, 8s, 10s, 12s, and
14s).  He faces a mandatory minimum sentence of 120 months and a maximum sentence of life
imprisonment on each of the seven Coercion and Enticement or Attempted Coercion and
Enticement counts (i.e., counts 1s, 3s, 5s, 7s, 9s, 11s, 13s).  He faces a 60-month mandatory
minimum sentence and a statutory maximum sentence of twenty years on each of his two
convictions for Distribution of Child Pornography (i.e., counts 6s and 15s).  Additionally, the
sentencing guidelines and statutory term of supervised release require a term of 5 years up to life
on each of the fifteen counts.  *See* PSR ¶¶ 182, 187-188, and 18 U.S.C. § 3583(k).

A Presentence Report ("PSR") has been prepared by U.S. Probation.  The PSR
determined the combined adjusted offense level to be 49, after including all relevant sentencing
enhancements and grouping principles.  With a three-level reduction for acceptance of
responsibility, the offense level is 46.  However, pursuant to U.S.S.G. Chapter 5, Part A,
Application note 2, in the rare instances where the total offense level is calculated in excess of

---

[2] There is no plea agreement in this case.

43, the offense level is to be treated as a level 43.  Therefore, with a total offense level of 43 and

a criminal history category of I, Defendant faces a guideline sentencing range ("GSR") of life.

*See PSR*, ¶¶ 67-141, 183.   Neither party objected to the GSR calculations.  The Court should

adopt the PSR.  Defendant's extremely high GSR reflects the seriousness of his crimes.

## II.    LEGAL CONTEXT

Defendant's criminal actions, his pattern of illicit sexual activity geared towards several

vulnerable minor female victims, and the viewing of the sexual exploitation of his minor victims,

for his own sexual gratification, are appalling.  He had complete disregard for the welfare of

these minor victims.  Numerous courts have emphatically expressed the wretched consequences

of child pornography.  In *United States v. Goff*, 501 F.3d 250, 258-59 (3rd Cir. 2007), the Court

noted:

> Children are exploited, molested, and raped for the prurient
> pleasure of [the defendant] and others who support suppliers of
> child pornography.  These small victims may rank as 'no one else'
> in [the defendant's] mind, but they do indeed exist outside his
> mind.  Their injuries and the taking of their innocence are far too
> real.  There is nothing 'casual' or theoretical about the scars they
> will bear from being abused for [the defendant's] advantage.

"It is an unassailable proposition that '[c]hild pornography harms and debases the most

defenseless of our citizens.'"  *See United States v. Grober*, 624 F.3d 592 (3rd Cir. 2010), citing

*United States v. Williams*, 553 U.S. 285, 307 (2008).  In *United States v. Cunningham*, 680

F.Supp.2d 844, 847 (N.D. Ohio, 2010), *affirmed* 669 F.3d 723 (6th Cir. 2012), the District Court

reasoned:

> There can be no keener revelation of a society's soul than the way
> in which it treats its children.  Given the current statistics
> surrounding child pornography, we are living in a country that is
> losing its soul.  Child pornography is a vile, heinous crime.
> Mention the term to your average American and he responds with
> immediate disgust and a sense of unease.  However, once it enters

4

> the legal system, child pornography undergoes sterilization. The sterilization goes far beyond properly removing emotion from sentencing decisions. Images are described in the most clinical sense. Victims all too often remain nameless. The only emotions on display are those of defendants, sorry that their actions were discovered by law enforcement.

In *United States v. Norris*, 159 F.3d 926, 929-30 (5th Cir. 1998), *cert. denied*, 526 U.S. 1010 (1999), the defendant claimed that when he received child pornography the children depicted were not victimized by the receipt. Rather, the defendant claimed that the victimization occurred solely when the child pornography was produced. *Id.* The Fifth Circuit thoroughly repudiated that argument as follows:

> The underlying point, however, is that there is no sense in distinguishing, as Norris has done, between the producers and consumers of child pornography. Neither could exist without the other…

*Norris*, 159 F.3d at 929-31 (emphasis in original)(citations omitted). Here, the defendant was both the producer and the consumer of the child pornography.

Additionally, Congress has repeatedly recognized that recidivism rates are particularly high for sex offenders.[3] Courts have recognized this as well. The Eleventh Circuit has noted that "child sex offenders have appalling rates of recidivism and their crimes are under-reported." *United States v. Pugh*, 515 F.3d 1179, 1201 (11th Cir. 2008); *United States v. Allison*, 447 F.3d 402, 405-406 (5th Cir. 2006) (Congress explicitly recognized the high rate of recidivism in convicted sex offenders, especially child sex offenders).

## III.    DISCUSSION OF 18 U.S.C. § 3553 FACTORS

---

[3] *See* Blaisdell, Krista, Note, *Protecting the Playgrounds of the Twenty-First Century:  Analyzing Computer and Internet Restrictions for Internet Sex Offenders*, 43 Val.U.L. Rev. 1155, 1192, n.150 (2009)(compiling Congressional statements regarding the high risk of recidivism among child sex offenders).

The government's recommendation accounts for the factors that the Court must consider outlined in 18 U.S.C. § 3553(a).  The factors include, but are not limited to, the nature and circumstances of the offenses, the history and characteristics of the defendant, the seriousness of the offenses, promoting respect for the law, providing just punishment for the offense, the need to deter the defendant and others, the need to protect the public from the defendant's crimes, and the need to avoid unwarranted sentencing disparities.  It is clear that the Defendant is a sexual predator who repeatedly targeted many vulnerable teenage girls.

### A.      The Nature and Circumstances of the Multiple Offenses

The government urges the Court to consider the nature and circumstances of the offenses, to recognize the extreme seriousness of his crimes, to assess those crimes for what they are, and for the enormous impact they have had on his multiple victims.  *See* 18 U.S.C. § 3553(a)(1).  The facts of this case are egregious and merit a very lengthy prison sentence, far more than the 15 year mandatory-minimum sentence.

The defendant knew exactly what he was doing when he lied about his gender and his age and assumed the fictitious on-line identities of a 21 year-old and 16 year-old female named "Marlie Bennett" ("Marlie") in order to meet teenage girls.[4]  On "Marlie's" on-line profile, the defendant listed "Marlie" as a female with a 1992 date of birth.  Using those fake identities, over the course of ten months between May 2014, and March 2015, he, as "Marlie," sought out and met each of the seven underage girls, who were between 14 and 16 years old at the time.  The defendant, as "Marlie," met the girls on-line in various chat rooms, including Teenspot and Kidzworld, as well as through Skype and Kik.  In one of the chat rooms the defendant sought

---

[4] The defendant pretended to be 16 year-old "Marlie Bennett" with Minor C.  With the remaining minor victims, he pretended to be 21 year-old "Marlie Bennett."

out, users discussed thoughts of suicide.  He, as "Marlie," would immediately exchange contact information with a minor and also asked the minors to emails photos of themselves to "Marlie." The defendant, as "Marlie," also sent photographs of a female whom the defendant indicated was "Marlie" to his minor victims.  The photographs depicted an unknown female in various states of nudity.[5]  The defendant also lied to some of the victims by stating how "Marlie" was trying to determine "her" own sexuality and asked for the victims' assistance.  He, as "Marlie," even told one victim that "Marlie" loved her.

The defendant began communicating on-line separately with each of his minor victims. He knew how young his victims were when he was communicating with them.  Many of the text messages and on-line chats between the defendant and his victims are sexually graphic.  In very short order, sometimes on the first day of communicating on-line with them, he, as "Marlie," began asking his victims to speak sexually with "Marlie" (i.e., sexting), to engage in on-line sexual role-play with "Marlie," and manipulated, coerced, enticed, or attempted to coerce and entice each to get naked, to masturbate, and to insert objects into their vaginas or anuses, while he either watched or demanded the victim take and email photographs of those sexually explicit acts to "Marlie."  Sometimes, the defendant coerced the victim to do this within the very first day of meeting her on-line.  "Marlie" persisted with these requests.  Sometimes, the defendant, as "Marlie," commented on the photographs he received by directing the victim to perform more painful sexual acts on herself and then photograph that act and email it to "Marlie."

When his victims would balk at continuing to perform sexual acts upon themselves and take and email pictures of same to "Marlie", including complaining to "Marlie" that the pain associated

[5] Investigators sent the photos of "Marlie" to the National Center for Missing and Exploited Children in an attempt to identify her.  However, no identification was made.

with inserting objects into their vaginas and anuses, he, as "Marlie," showed no remorse.  Instead, he tried to gain their sympathy by threatening to inflict bodily harm on "Marlie" (i.e., via cutting), and also extorted and threatened to expose the victims by posting on-line the images he had previously made the victims take of themselves, and email to "Marlie," Some of these girls were struggling with personal issues and challenging family situations which they shared in confidence with "Marlie," and "Marlie" later threatened to expose this very personal information.   "Marlie" also threatened to contact the victim's parents, their schools or the authorities or to harm a victim's family.  In some cases, the defendant, as "Marlie," threatened to travel to the minor victim's state to find her.  In this way, the defendant was able to manipulate his victims to continue to send "Marlie" additional sexually graphic photographs of themselves.  He repeatedly exploited his many minor victims for his own sexual gratification, with blatant disregard for the welfare of the minor victims and for the law.

Yet, the defendant, as "Marlie," went even further by also emailing sexually explicit photographs of Minor A to Minor A's own mother, and also sent sexually explicit photographs of Minor D to Minor C.  After Minor A disclosed to her mother what happened and Minor A's mother began communicating on-line with the defendant, he, as "Marlie", asked Minor A's mother to switch places with her daughter and become his on-line sex slave.  The defendant, as "Marlie," emailed Minor A's mother five photographs taken of Minor A by the defendant during a Skype video chat with the following communication attached:  "I made your daughter do pictures."  Those photos included depictions of Minor A with her breasts exposed, one of Minor A standing completely naked in a bathtub, and another depicting Minor A standing fully unclothed with her back turned to the camera in a bathtub with an object visibly protruding from between her buttocks.  The defendant revealed himself to none of his minor victims.  However, Minor A's mother was able to convince him to uncover the camera when she and he were having an on-line FaceTime conversation.  During

that conversation, the defendant told Minor A's mother the following: "[S]ee, I'm an old cripple fuck...".

One of the images that the defendant distributed via email to Minor C depicted Minor D unclothed with a toilet brush handle inserted into her anus. When he sent that image to Minor C, the defendant, as "Marlie," texted Minor C the following message: "that was her face from what I had her do." At the time, Minor D was a 14 year-old, middle-school eighth grader and the defendant knew that. He knew how young his victims were when he was communicating with each.

The defendant, as "Marlie," often threatened his victims, ordering them to comply with "Marlie's" sexual directives. In one case, he, as "Marlie," Skyped to a victim, the following messages: "rub and finger/your v[agina]/do it/I own you remember that/rub and finger/ you will do and say it until I release you that could be tonight tomorrow days weeks months understand...you obey I stay quiet and things stay safe... you are my slave understand/ want me quite and things not exposed?...[I] do what I did to you/done it for awhile now...how does it feel to be the victim?...you are mine until I release you do you understand?...i guess your forgetting the pics I have of you...what do you have bigger to shove dep in your butt by you?" He coerced and threatened victims to insert objects such as a marker, a pen, or a toilet brush handle, into their vaginas or anuses while he watched or ordering them to photograph that act and send the photo(s) to him electronically. One victim Skyped the following message to "Marlie": "Im only being this way because you forced me." While chatting on-line with another victim, the defendant, as "Marlie," told her "...but its fine I can still expose you for who you really are" and "that's fine I'll just take it out on others."

The defendant's complete disregard for the well-being of the victims is evident. During an on-line conversation, one minor victim asked "Marlie" the following question in one of the on-line chats: "why are you making me do this? Im only 16. Youre 21." In another case, one victim was watching her younger sibling and after the defendant, as "Marlie," texted that "Marlie" wanted a full body nude backside photo with something deep in the victim's buttocks, the victim told "Marlie" that

she would have to take that one later because she needed to keep the window of the home open to watch her younger sibling who was out in the pool.  In response, the defendant texted "I want it now." When that victim texted that she has been going through a lot, the defendant's response was "don't care.  I should matter and be more important regardless.  When the victim then told "Marlie" that the victim's mother being in the hospital because she was physically assaulted is more important, the defendant had complete disregard for that and told the victim that "Marlie" expected the victim to "correct [her] behavior…"  On a later date, the defendant, as "Marlie," told that victim that "Marlie" owned the victim and that "Marlie" has the pictures to prove it.  Some victims told "Marlie" that it hurt badly to insert an object into their vagina or anus.  But the defendant did not care about the pain his victims endured because of him.

During the forensic interview of one minor victim, she related that "Marlie" threatened and harassed her and talked about finding her and she got really scared so she did want Marlie asked even though she didn't want to do it.  She just wanted "Marlie" to stop.  With another victim, the defendant, as "Marlie" was very specific in "her" demands.  This included time-frames by which the victim had to bathe, and directives of what times throughout the day the victim had to call "Marlie." For one victim, the defendant texted "do you want me to stay quiet? It's up to you….You belong to me until I let you go understand."  That victim then texted "Marlie" the following:  "can I get dressed" to which the defendant, as "Marlie," responded "Once I get a picture with something deep in."  The victim told "Marlie" that she can't do that because "it will hurt really bad and I am already in too much pain."  A short time later, the defendant texts "Good shove it in deep take a pic then a face shot of how it feels" and the victim then asks "[c]an I just ask why you are doing this?"  In response, the defendant texted "I can." To yet another victim, the defendant, as "Marlie," texts "well I'll make you a deal you keep helping me fully and I stay quiet and no one sees" and "give me what I want and I move on simple…this is your fault not mine."

10

The defendant, as "Marlie," lied to a victim by telling her that he, as "Marlie," was being sexually assaulted by a female, and the only way to make "Marlie's" attacker stop would be for the victim to perform sex acts on herself and to email or text the photos to "Marlie" who indicated "she" would show them to her assailant.

After Minor A disclosed the defendant's criminal conduct, Minor A's mother reached out to the defendant on-line and asked what photos "Marlie" had of her daughter. She later received a text from the defendant asking her to replace her daughter as "Marlie's" sex slave and threatened to expose her daughter and post the sexually explicit photos of her daughter if she refused. As stated earlier, the defendant also distributed child pornographic images of Minor A to her mother. Minor A was the first to report to authorities. Thereafter, authorities in Minor A's state were able to confirm the defendant's identity, which Minor A's mother has previously been able to do on her own. Authorities in that state then reached out to Massachusetts authorities.

Thereafter, on April 2, 2015, a search warrant was executed at the defendant's Massachusetts residence. He was home at the time. Post-*Miranda*, the defendant admitted to using a fictitious female name of "Marlie Bennett" when he communicated on-line with females. He stated he portrayed himself on-line as different ages, including age 21, when he was on Skype in order to chat with girls 13-21 years of age or older. When asked about girls under age 18 with whom he had on-line conversations with, he stated the conversations were sexual in nature. When asked what kind of sexual overtones he had with these girls, he replied it was cybersex. When asked if he ever asked these girls to do [sexual] things to themselves the defendant responded "just pictures." When asked what kind of pictures the underage girls sent to the defendant, he replied "just nude". When asked if the girls took nude pictures of themselves, he replied in the affirmative. When asked if he ever asked the girls to do specific things to themselves the defendant replied "sometimes, yes."

11

**B.      History and Characteristics of the Defendant**

In his interview with U.S. Probation, the defendant denied experiencing any form of

abuse as a child, indicated he has no substance abuse history, and that he has never been

diagnosed with a mental health condition (although he stated that he feels as if he suffers from

depression and anxiety, which he attributes to feeling depressed and the fate of the instant

offense as causing him anxiety).  *See* PSR ¶¶ 151, 170, 172.  The overriding aspect of the now 39

year-old defendant's personal characteristics is his clear and deviant sexual interest in children,

which raises a substantial risk of recidivism.   This was not a single instance of criminal activity.

Rather, it was a repeated, calculated and intentional effort by the defendant directed at many

teenage girls, occurring over an approximately ten-month period.  He deliberately chose to

exploit, threaten, and extort these vulnerable girls.  Defendant's risk of recidivism is underscored

by the findings of Congress, the courts, and researchers:

> Congress has repeatedly reiterated that recidivism rates are
> particularly high for child sex offenders.  *See* Blaisdell, Krista,
> Note, *Protecting the Playgrounds of the Twenty-First Century:*
> *Analyzing Computer and Internet Restrictions for Internet Sex*
> *Offenders*, 43 Val. U. L. Rev. 1155, 1192, n. 150 (2009)
> (compiling Congressional statements regarding the high risk of
> recidivism among child sex offenders).  Similarly, the Eleventh
> Circuit has noted that "child sex offenders have appalling rates of
> recidivism and their crimes are under-reported."  *United States v.*
> *Pugh*, 515 F.3d 1179, 1201 (11th Cir. 2008).  In addition, one
> study of sex offenders found an overall recidivism rate of 31.7%.
> Kingston, Drew, et al., *Pornography Use and Sexual Aggression:*
> *The Impact of Frequency and Type of Pornography Use on*
> *Recidivism Among Sexual Offenders*, Aggressive Behavior,
> Volume 34 (2008).  The predicted odds of recidivism increased by
> 177% among the offenders that viewed deviant pornography, such
> as child pornography. Moreover, the predicted odds of violent
> recidivism, including sexually violent recidivism, increased by
> 185% for this group.  The predicted odds of any type of sexual
> recidivism increased by 233% for the group that admitted to
> viewing deviant pornography. This increased risk of recidivism
> among sexually deviant offenders has also been found in earlier
> studies, including a meta-study from 1996.  *See* Hanson, R. Karl,

and Monique Bussiere, *Predictors of Sexual Recidivism: A Meta-Analysis*.

*United States v. Cunningham*, 680 F.Supp.2d, 844 at 855 (2010).

It is expected the defendant will argue for the lowest possible sentence allowable by law, namely, a 15-year mandatory-minimum sentence.   It is further expected that the crux of the defendant's sentencing argument will not be on the nature or circumstances of this case.  Rather, it is anticipated that he will focus on the defendant's significant life-long medical conditions, and the difficulties he claims he will face in prison as a result of his varied medical issues, are overriding reasons for the Court to downwardly depart so significantly from a GSR of life to lowest sentence allowable by law (i.e., 15 years).  The government is in no way contesting that the defendant has significant medical challenges and issues.  In fact, the government has considered that information in recommending a sentence that is below the advisory guideline range of life in prison.   However, this case calls out for a sentence far higher than the mandatory-minim sentence.

The government expects the defendant to argue that he cannot be properly cared for while serving a committed sentence in the Bureau of Prisons ("BOP") and should therefore be treated far more leniently than other similarly situated defendants.  This is inaccurate.   Rather, BOP is fully equipped to address all of the medical conditions of its inmates and this includes the defendant.  Additionally, none of his medical issues hampered his ability to commit crimes against children.  Not one of the defendant's physical ailments or medical infirmities got in his way of committing these horrific crimes.

As evidenced by the July 7, 2017, letter submitted by John Manenti, Medical Director of the Northeast Region of the BOP, and filed with the Court, the BOP can adequately care for defendant's host of medical issues.  *See* Exhibit #3.  As part of Exhibit #3, in addition to the

letter of Medical Director Manenti, BOP provided an attachment entitled "Management of Diabetes, Federal Bureau of Prisons, Clinical Guidance, March 2017."[6]  Per the letter, BOP does have the ability to provide adequate health care for federal prisoners with significant, acute, or chronic medical conditions.  BOP is aware of the defendant's medical conditions and diagnoses. Dr. Manenti describes how BOP has "implemented a medical care level classification system. The care level classification system is intended to enhance the BOP's ability to manage inmate health care effectively by matching inmates with those institutions that can best meet their medical needs, while at the same time achieving optimal use of the BOP's health care resources."  *See* p.2 of Exhibit #3.  He goes on to explain that "[m]edical referral centers ("MRC") are prisons that provide in-patient care to seriously ill inmates.  The BOP has seven of these centers throughout the United States.  Besides providing chronic care for seriously ill inmates, these medical centers also provide services such a chemotherapy, pain management clinics, dialysis and hospice care for terminally ill inmates.  Each medical center also has a long-term unit for inmates requiring 24-hour nursing care."  There are also in-house Nursing Care Center Units ("NCC's") in three of BOPs' MRCs which provide additional medical attention beyond hospitalization that cannot be provided in the ambulatory setting."  *See* p.2 of Exhibit #3. Additionally, "[a]ll inmates entering our facilities are thoroughly screened by medical staff for physical and mental health conditions.  They are monitored thereafter through follow-up appointments and chronic care clinics, as necessary.  A medical plan of action for an inmate includes a thorough and timely history and physical exam to ascertain the mental health and medical status of each inmate upon their arrival to a Bureau facility.  Following this screening,

---

[6] The BOP letter and attachment are attached as Exhibit #3.

the treating Clinical Director and Chief Psychologist may formulate a plan that addresses his

medical, mental health and activities of daily living.  This plan may include assessment of the

daily functioning, i.e., handicap living quarters,.. ambulatory aides or bracing, inmate companion

for assistance of activities of daily living…Every general population institution runs a number of

Chronic Care Clinics designed to provide routinely scheduled quality care to medically ill

inmates, as well as to stay cognizant of any changes in medical conditions that may arise.  If Mr.

Debrum is designated to a general population institution, it is likely he would be assigned to the

Diabetic, General, Hypertension, Mental Health, Neurology, Orthopedic/Rheumatology, and

Pulmonary Chronic Care Clinics.  Inmates enrolled in Chronic care Clinics are seen as often as

medically necessary.  Additionally, the BOP has published guidance that provides BOP

clinicians with recommendations for the medical management of inmates with diabetes…"  *See*

p.3 of Exhibit #3.

This Court should credit the assurances of current BOP staff that they can adequately care

for the defendant, rather than a former employee, who has been out of the BOP setting for many

years, and who has no influence over how or where the defendant will be treated once his

sentence is imposed.  Further, it is expected that defendant will argue that the enormous cost the

government would bear to incarcerate the defendant weighs heavily in support of his argument

for the lowest sentence allowable by law.  To suggest that this Court should impose the

minimum sentence available because it would cost the government tens of thousands of dollars

per year totally ignores the magnitude of the defendant's criminal behavior.

**C.     The Requested Sentence Is Needed to Reflect the Seriousness of the Offenses, to Promote Respect for the Law, to Provide Just Punishment for the Offenses, Afford Specific and General Deterrence, and to Protect the Public from Future Crimes of the Defendant**

The seriousness of these crimes for which the defendant now stands convicted cannot be

underscored or minimized.  He has negatively affected the lives of many minor girls through his

criminal acts.  In examining the seriousness of the offenses, the Court must review the harm to

the victims.  *See Cunningham*, 680 F.Supp 2d at 844, 855 (N.D. Ohio, 2010).  The impact the

Defendant's heinous actions has had on these minor female victims is enormous.  In short, it has

caused untold heartache, anxiety and fear upon the victims and their families.   The continuing

impact the defendant's crimes have had on his victims is reflected in the submitted victim impact

statements.[7]  The devastating toll this case has taken on these minor victims is best summed up

by the victim impact statements submitted.

　　　　Minor C, whom Debrum pretended to be a 16 year old female teenage when

communicating on-line with her, wrote, in part:

　　　　"Before Joseph Debrum had the opportunity to come into my life, I was a soft, shy, quiet
person who always noticed the good and kindness in everybody around … Helping anyone who
needed help with anything was my biggest strength; however, I guess you could say that it was
my biggest weakness…, being so I wanted to help "Marlie Bennet," who had come to me,
online, for help in discovering "her" true self.  I made it my priority to help Marlie, but I soon
realized I had made a mistake in trusting "her" with my information…, as "she" quickly became
sexually aggressive…
　　　　The day that Homeland Security brought me in for questioning was simultaneously one
of the best and worst days of my life, for it was the day the prolonged cyber-torture could
officially end, but it was also the day that I discovered that my predator, was, in fact, not only a
man, but a man almost three times my age.  From that day forward, I was a completely different
human being.  I became a hard, depressed person who no longer trusts…and doubt and suspicion
will always be at the front of my mind when dealing with anyone both on and off the internet…
　　　　Not a day passes where the repulsive thought of this man violating me for months on end
do not pry into my mind.  Not a day passes where I do not think, with sadness, about all of the
other victims who had also been tethered and violated by this man, and how the experience has
impacted them as well.  Not a day passes where I do not completely shut down at least once from
the concentrated severity of these thoughts, where I am unable to speak, talk, look, or think about
anyone or anything but the horrible, mental suffering.  These thoughts haunt me day and night,
as they even frequently find their way into my dreams.  The actual occurrence of the abuse was
atrocious, but the aftermath has been an atrocity of its own.  I constantly wonder if and how I am
ever going to be able to trust another human being ever again.  The person I decided to spend my
time with in order to improve their life destroyed mine…"

---

[7]Minor A's mother's victim impact statement is attached as Exhibit #1, Minor C's victim impact statement is
attached as Exhibit #2, Minor B's victim impact statement is attached as Exhibit #4, Minor B's mother's impact
statement is attached as Exhibit #5, and Minor H's victim impact statement is attached as Exhibit #6.

Minor A's mother submitted a victim impact statement as well.   In it, she wrote, in part,

the following:

"In May of 2014,…[o]ver the course of serval days, Mr. DeBrum was able to manipulate enough personal information out of my daughter so that he could force her to do his bidding under the threat of exposing that information publicly. My daughter did not engage in sexually explicit acts by choice, but out of fear.  She became the slave of Mr. Debrum.  The sexually explicit acts that my child was forced to engage in by Mr. DeBrum were humiliating, sickening and physically painful for her and when she could no longer bare the physical and emotional torture she stepped through her fear and told a trusted adult.

The crimes that Mr. DeBrum committed against my daughter had a huge impact on both her and our family.  The scene of these crimes was her own bedroom in our family home.  A place that was once a refuge for her had become a place of nightmares.  The memories of pain, humiliation and fear became overwhelming as she was forced to live within the same 4 walls that the crimes occurred in.  She became anxious, depressed and hypervigilant.  In this state of mind, learning was impossible and school was something that she had to give up on. . . In the summer of 2015 my then 17 year old daughter left the only home that she had ever known and moved over 600 miles away in order to relive herself of the constant reminders of Mr. DeBrum and to start a new life.  She even changed her name in order to symbolically leave behind the girl who had been so horrifically victimized….

He [Debrum] was well aware of the damage and pain that he was causing an innocent child to endure.  Prior to his arrest, I had the opportunity to have several conversations with Mr. DeBrum pertaining to his crimes against my child.  He showed zero remorse and after emailing me pornographic images of my own daughter he proceeded to tell me that he believe that 16 was old enough, that my daughter was a whore and that the authorities would never arrest a cripple. He had the audacity to attempt to sue the same manipulative tactics on me that he used on my daughter threatening to post those images publicly for all to see unless I agreed to replace her as his slave…"

Minor B as well as Minor B's mother each submitted a victim impact statement.  Minor

B wrote, in part, the following:

"…I can never forget about what he did.  I am no longer able to trust as easily, and I am more closed off with my feelings. I feel that I am worth nothing now.  I've been used, so who really wants me anymore.  My anxiety heightens whenever I get a text, because I'm always worried that it's him, back to take advantage of me again.  I worry that he will be set free.  I worry that he will take advantage of me and many other girls again…"

Minor B's mother wrote, in part, the following:

"I have nightmares now, not every night anymore, but often enough that it stays on my mind…Before all this, [Minor B] was worried about homework, her friends, and cleaning her room.  Now she is worried about who she can trust, who she should be afraid of, who is going to lie and manipulate her into doing things that she doesn't want to do.  That is our reality now,

these unseen forces across cyberspace that bully and lie and manipulate innocent children, my innocent child of 13, into doing things that no 13 year old child should even know about.  It damages them emotionally, and their family, for the rest of their lives…He robbed her of that innocence; he threatened her and scared her into submission…As a parent, my biggest fear is that something will happen to [Minor B] that I can't prevent.  Because of Joseph Debrum, that fear became a reality..."

In her victim impact statement, Minor H, wrote in part, the following:

"… [a]nd when I didn't do what she wanted she would say awful things to make me do what she wanted.  When I finally had enough of Marlie controlling everything I did, I told her I was done being her submissive and I wanted her to leave me alone.  She told me if I told anyone she was going to kill my family….I thought everything was going to be okay but I was still scared for my life because she knew everything about me such as my address, phone number, parents names, and my little [siblings] names...

When I first found out "Marlie" wasn't' a women I was disgusted…I wanted to just be left alone, and I didn't want to deal with any of this.  It wasn't' until I found out Mr. Debrum had multiple other victims including myself across the country.  I then decided that coming forward was the right thing to do.  What Mr. Debrum has done to his victims is scar us with humiliation and regret…"

It is clear that the defendant has negatively affected the lives of these multiple victims through his coercion, enticement, and sexual exploitation of minors (i.e., production of child pornography), as well as his distribution of child pornography.  The government's requested sentence is "sufficient, but not greater than necessary," to account for this conduct and to accomplish the goals of § 3553(a).  *See* 18 U.S.C. § 3553(a).  Imposing serious penalties on those who coerce and entice minor children, who sexually exploit minors, and who distribute child pornography, serves the interests of all the minor victims in this case.

A sentence of 24 years (i.e., 288 months) will appropriately serve as both a general and specific deterrent to future conduct involving the coercion, enticement and exploitation of children, and protect the public from further crimes of the defendant.  *See* 18 U.S.C. § 3553(a)(2)(B) and (C).  "[S]entences influence behavior, or so at least Congress thought when in 18 U.S.C. § 3553(a) it made deterrence a statutory sentencing factor."  *Also, see United States v. Goldberg,* 491 F.3d 668, at 672 (7th Cir. 2007)(a sentence affects the life of the criminal and the

lives of his victims); *see also Goff*, 501 F.3d at 261 (stating in child pornography possession case that "deterring the production of child pornography and protecting the children who are victimized by it are factors that should have been given significant weight at sentencing").

Imposing serious penalties on individuals who actively participate in the child exploitation market may also deter other individuals from joining in its ranks.  Defendant, pretending to be a 21 year-old female and a 16 year-old female, exploited many children while hidden behind a computer screen in his own home over a period of time.  These minor victims are not abstractions or objects—they are real people who experienced sexual exploitation for these pictures or images to be produced and distributed.  A significant term of imprisonment reinforces, to the defendant and to others who are tempted to follow in his footsteps, that these crimes are exceedingly grave in nature, should act as a deterrent, and would promote respect for the law and to protect the safety of the public, and in particular, children, who are the most vulnerable victims in society.  The best protection for the most vulnerable population in our society, would be for the defendant to receive a very lengthy prison sentence, one that is being recommended by the government.

## IV.    CONCLUSION

Defendant has participated in some of the most heinous crimes in our society, namely, repeatedly victimizing and exploiting multiple minor children.  The facts of this case are horrific and call out for a very substantial sentence.  The Government's recommended sentence addresses the severity of his crimes, and is appropriate and reasonable.  As such, the Government urges this Court to impose it.

Respectfully submitted,

WILLIAM D. WEINREB<br>
Acting United States Attorney

By:    */s/ Suzanne Sullivan Jacobus*
       Suzanne Sullivan Jacobus
       Anne Paruti
       Assistant U.S. Attorneys

Dated: July 14, 2017

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system and thereby served an electronic copy on counsel for the defendant.

*/s/ Suzanne Sullivan Jacobus*
Suzanne Sullivan Jacobus
Assistant U.S. Attorney